[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 27, 2004
THOMAS  K. KAHN
CLERK

No. 03-13233

D. C. Docket No. 02-00221-CR-CG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RODNEY L. SIMMS,
a.k.a. Dina Falcone, etc.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

**(September 27, 2004)**

Before DUBINA, CARNES and CUDAHY[*], Circuit Judges.

CUDAHY, Circuit Judge:

_____

[*]Honorable Richard D. Cudahy, United States Circuit Judge for the Seventh Circuit,
sitting by designation.

I.

On September 2, 2002, Officer Terry L. Munn of the Alabama Department of Public Safety observed a silver late-model sedan tailgating a white Jeep. He initiated pursuit, and while following the vehicle, was radioed by Alabama State Trooper Charles Anderson, who told Munn to "be on the lookout" (BOLO) for a silver Mercury Sable with a Florida tag, gave Munn the full tag number and told him that the car was possibly transporting narcotics. (R. 5 at 212.) The description of the car in the BOLO matched the description of the car Munn was following. Munn pulled the car over, and it was being driven by the defendant, Rodney Simms.[1] Anderson soon arrived on the scene to assist Munn. During the traffic stop, Munn noticed that Simms appeared extremely nervous, with hands shaking. Simms also had a large cut on the side of his neck that had been stapled or stitched together. Munn advised Simms that he would be issued a traffic warning and asked him to accompany Munn back to his patrol car.

At the patrol car, while they waited for the results of checks on Simms' license, registration and outstanding arrest warrants, Munn, Anderson and Simms engaged in conversation about Simms' injury. Simms explained he was headed

---

[1]Munn's patrol car had video- and audiotaping equipment. The videotape of Simms' traffic stop commenced shortly before Simms was pulled over and recorded the entirety of the stop and search, though the audio was intermittent.

back to West Palm Beach, Florida after receiving medical treatment at a Veteran's Administration (VA) hospital in Houston. Both officers thought that this sounded a bit fishy. And Simms continued to appear very nervous even after being told that he was only getting a warning citation, which both officers thought was unusual in their experience. Immediately after receiving the results of the checks on Simms' records, but before returning Simms' documents to him, Munn asked Simms if he was transporting contraband and then obtained first oral, then written consent to search the vehicle. After written consent was obtained, the officers returned Simms' documents.

Anderson conducted the search. In the trunk, he found a steel wall that had been covered with carpeting, which extended across the back of the trunk, creating a secret compartment between the rear seat of the passenger compartment and the faux back of the trunk. Simms, when asked, denied any knowledge of work done to his car, which he had purchased only recently. A drug-sniffing dog alerted when it reached the steel wall in the trunk, and Anderson drilled through the wall. The drill bit came out covered with a white substance that field tested positive for cocaine, and Simms was arrested.

The BOLO, as it turns out, had been provided to Anderson by an agent of the Alabama Bureau of Investigation, David Fagan. The BOLO originated from

3

officials in Houston, Texas, who had obtained a state court order allowing a tracking device to be installed on Simms' car. The court order provided that the tracking device could be used legally only within Texas, but it was apparently used to track the vehicle into Alabama, and the BOLO was based partly on information obtained from the tracking device after the vehicle was no longer in Texas. Specifically, a Houston police officer, Genni Ruzzi, who was also on a Drug Enforcement Administration (DEA) task force, had obtained the court order for the tracking device, had tracked Simms' car to Alabama and had then telephoned Sam Houston of the DEA. Houston contacted Fagan and provided him with the vehicle's location and description, which was then passed along to Anderson and subsequently to Munn in the form of the BOLO.[2] After Simms was arrested, Fagan arrived on the scene and spent several minutes rummaging around the vehicle, during which time he apparently removed the tracking device.

The court order authorizing the tracking device was obtained pursuant to an

---

[2]The BOLO that Anderson passed along to Munn was for a silver Mercury Sable with a Florida tag (including the full tag number of the vehicle) and mentioned that the car was possibly transporting narcotics. (R. 5 at 212.) Thus, the BOLO in and of itself would not appear to provide probable cause to search or arrest. But it might be sufficient to provide the basis of reasonable suspicion to prolong a *Terry* stop, even without the additional factors the officers pointed to. However, it is not necessary to rely on it for that purpose. The effort of the government not to reveal the existence of the tracking device appears not to spring from the mistaken belief that there was something unconstitutional about its use outside of the geographical boundaries of the court order but from a desire not to disclose the circumstances of its attachment.

4

investigation of a suspected cocaine distributor, Oscar "Last Name Unknown" (LNU), who was later determined to be Oscar Martinez. A confidential informant (CI) had provided the police with information linking Martinez and Simms. During Simms' stay in the Houston VA hospital, his car was at various times in the hands of Martinez, the CI (who installed the secret compartment) and the DEA (which installed the tracking device).

Simms was indicted by a grand jury and charged with one count of possession with intent to distribute approximately 17 kilos of cocaine in violation of 21 U.S.C. § 841(a)(1). Simms filed a motion to suppress the cocaine, which was denied. However, Fagan later admitted to having instructed Munn and Anderson prior to the suppression hearing not to reveal the BOLO or tracking device unless directly questioned.[3] As it turned out, individuals involved with the case in the U.S. Attorney's office who were aware of the tracking device had not informed U.S. Attorney E.T. Rolinson, who was in charge of prosecuting Simms' case at that time, of the existence of the tracking device or of the BOLO. When Rolinson learned of the tracking device subsequent to the suppression hearing, he disclosed it to the court and the defense, and a continuance of several weeks was granted to allow discovery and briefing of the issue. The government apologized

---

[3]*See* our discussion at n.2, *supra*.

to the court for its mishandling of the situation. Simms subsequently filed a motion to reconsider the denial of his motion to suppress and a motion to reopen the suppression hearing, both of which were denied. At trial, a jury found Simms guilty of possession with intent to distribute more than 5 kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1). The court sentenced Simms to 262 months in prison.[4]

## II.

As an appeal of a final judgment of the district court in a criminal case, we have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## III.

Simms raises several issues on appeal.

A. Did the district court err in conducting an ex parte hearing with the government during trial?

---

[4]Simms apparently also made a confession to Richard McAfee, an officer of the Palm Beach County Sheriff's Office in Florida. Although in his brief on appeal Simms characterized the confession as an "alleged" confession (Appellant's Br. at 25) and challenged McAfee's testimony, Simms never outright denied that he confessed. Although the government mentions Simms' confession, it never again refers to the confession in arguing the merits of Simms' appeal. We therefore note the existence of an alleged confession, but we do not consider its possible relevance to any of the issues on appeal.

B. Did the district court err in denying the appellant's motion to suppress drug evidence discovered in a hidden compartment in his vehicle, and/or did it abuse its discretion by denying the appellant's motion to reopen the suppression hearing in order to allow cross-examination and confrontation of witnesses in light of the newly disclosed existence of the tracking device?

C. Did the district court err in violation of local court rules in refusing to require pretrial disclosure of alleged *Brady* material and in erroneously refusing to grant a continuance when alleged *Brady* material was disclosed during trial?

D. Did the district court abuse its discretion by refusing to hold an evidentiary hearing concerning the appellant's claims of government wrongdoing?

E. Did the district court plainly err under Fed. R. Evid. 106 when it denied the appellant's motion to play a portion of a videotape?

F. Did the district court err under Fed. R. Crim. P. 16 or local rule 16.13 when it refused to compel the government to disclose the actual tracking device and to furnish information as to its use?


**A.**

Simms characterizes the ex parte discussions that took place between the government and the district judge on the first day of trial as improperly including

"defensive theory, potential objections to testimony and the consequences of those objections." (Appellant's Br. at 41.) Being unaware that the ex parte discussion would encompass those topics, he argues that he had no opportunity to object to that aspect of the discussion until he learned of it in a subsequent review of the transcript.

The government bears the burden of showing that the defendant was not prejudiced by an ex parte communication, and the burden is "a heavy one." *United States v. Minsky*, 963 F.2d 870, 874 (6th Cir. 1992) (citations omitted). Ex parte communications are, however, justified in order to protect a continuing criminal investigation and the safety of persons placed at risk by those investigations. *See United States v. Nava-Salazar*, 30 F.3d 788, 801 (7th Cir. 1994). Here, the ostensible purpose of the ex parte discussion was to determine whether certain evidence related to the CI and to a continuing criminal investigation of Oscar Martinez was *Brady* material, which the defendant would be entitled to be made aware of. Simms does not object to that aspect of the ex parte hearing. Rather, he argues that the impropriety of the ex parte hearing was its alleged deviation from discussing the disclosure of sensitive *Brady* material to improper topics such as advice from the judge to the government as to when and how to object to testimony and a general discussion with the government of

8

Simms' theory of defense. Our review of the transcript from the ex parte hearing, however, reveals no discussion which could have prejudiced the defendant. We simply do not see how either the course or the results of the trial would have differed if the disputed portion of the discussion had not taken place—after all, the government does not need advice from the court on making objections. At oral argument, the only other prejudice Simms could point to was a purported lack of opportunity to develop a full record and lack of a fair tribunal. But Simms has shown us no evidence that the tribunal, ex parte discussions notwithstanding, was anything other than "full and fair."[5] Because Simms did not suffer any prejudice from the purportedly off-topic discussions, we find that there was no error.

**B.**

Simms argues that the search of his car was illegal for three reasons, and that the fruits of the search should have been suppressed. First, he argues that the traffic stop had ended by the time his consent to search was requested (and given), and that only after he had consented, were his license and registration returned to him. Second, he argues that the tracking device was used illegally outside the

---

[5]Simms' other objections to the nature of the tribunal, as we address below, similarly fail to demonstrate that the tribunal was other than "full and fair."

9

scope of the warrant, resulting in the BOLO, which contributed to the officers' decision to search his car, and that the fruits of the search must therefore be suppressed. Third, he contends that, after the existence and use of the tracking device came to light, the suppression hearing should have been reopened so that he could cross-examine the officers and impeach their credibility with respect to their testimony about the factual basis for stopping and searching his vehicle.

**1.**

Simms argues that his consent to the search was given only after the traffic stop had ended (or should have ended), and that his consent was therefore invalid. Thus, if Simms' consent was obtained as the result of an illegal detention, the search was invalid. *See Ohio v. Robinette*, 519 U.S. 33, 51 (1996) ("Because [the defendant's] consent to the search was the product of an unlawful detention, 'the consent was tainted by the illegality and was ineffective to justify the search.'") (quoting *Florida v. Royer*, 460 U.S. 491, 507-08 (1983)). Ordinarily, when a citation or warning has been issued and all record checks have been completed and come back clean, the legitimate investigative purpose of the traffic stop is fulfilled, and the driver's license and other documents should be returned. *See United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001) ("After Trooper DeWitt

10

had completed this initial investigation and determined that Jones was neither tired nor intoxicated, that his license and registration were valid, and that there were no outstanding warrants for his arrest, then the legitimate investigative purposes of the traffic stop were completed."). For a *Terry* stop to be valid, "the Fourth Amendment intrusion 'must be temporary and last no longer than is necessary to effectuate the purpose of the stop' and . . . the officer should employ the least intrusive means available to dispel the officer's suspicion in a timely fashion." *Id.* at 924 (quoting *Royer*, 460 U.S. at 500). If a traffic stop is unjustifiably prolonged past the point when a driver's documents should have been returned, it may be found to have ended at the point when the documents should have been returned, and not when they were actually returned. *See United States v. $404,905.00 in United States Currency*, 182 F.3d 643, 649 (8th Cir. 1999). However, we have held that "an officer may prolong a traffic stop if he has articulable suspicion of other illegal activity." *United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir. 2003) (internal citation omitted).

Simms asserts that the videotape of his traffic stop shows that his consent was obtained only after the warning had been issued and after the checks on his license, registration and outstanding warrants had already been completed and had come back clean. Simms therefore argues that the legitimate investigative

11

purposes of the traffic stop were over, and there was no reason to question him about contraband or seek his consent to a search of his car. Based on our review of the videotape of the traffic stop, Simms is correct that the results of the various checks appeared to have been broadcast during a long "radio burst" that occurred immediately before Munn first questioned Simms about carrying contraband and asked if he minded if they searched his car.[6] Although we do not believe that the very brief period of time (approximately 30 seconds) that elapsed between the end of the long "radio burst" and Simms' oral consent to a search of his vehicle[7] is sufficiently long to turn a completed traffic stop into an illegal detention, we will nonetheless analyze whether the officers had an "articulable suspicion" of other illegal activity that justified prolonging the traffic stop.

At trial, Munn testified that the BOLO and Simms' continued nervousness

---

[6]The district court also found that Munn had issued the warning ticket and received the radio report with the results of the checks on Simms before he asked about contraband or sought consent to search Simms' car. (12/13/02 Order at 2.) The government argued at oral argument that it was difficult to know exactly when the results of the information checks came back because the quality of the audio prevented the content of the radio bursts from being audible. Thus, the government contended that the investigative portion of the traffic stop may have continued even after Simms had consented to the search. Although Munn's testimony at the suppression hearing concerning the timing of events during the traffic stop is in keeping with the government's argument, it does not seem to comport with the videotape. Our understanding of the timing of events based on our review of the videotape is in keeping with the district court's findings.

[7]After Simms gave his oral consent to a search, Munn gave him a search consent form, which Simms signed approximately one minute and 20 seconds later.

even after he found out he would only be receiving a warning were among the factors that led him to ask whether Simms was transporting anything illegal.[8] (R. 5 at 113-14, 160.) Munn also testified at the suppression hearing that "something didn't appear right" with respect to Simms' story about going to the VA hospital in Texas instead of to one closer to his home in West Palm Beach, Florida. (R. 3 at 11.) We also note that, although Munn did not specifically mention this as a factor, Munn learned during the long "radio burst" that Simms had a prior arrest involving drugs. Since Munn's questions about transporting contraband and his request for consent to search followed immediately upon the end of the long radio burst, it is possible that this, too, was a factor in his decision to prolong the stop. "When making a determination of reasonable suspicion, we must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. It is clear that an inchoate and unparticularized suspicion or hunch of criminal activity is not enough to satisfy the minimum level of objectivity required." *United States v. Perkins*, 348 F.3d 965, 970 (11th Cir. 2003) (internal citations and quotations

---

[8]Although Munn testified at the suppression hearing that Simms' traffic violation was the only criminal activity of which he had reasonable suspicion before the cocaine was discovered pursuant to a search of the vehicle (R. 3 at 41.), at trial it appeared that Munn's testimony at the suppression hearing was due to a misinterpretation of the question as focusing on whether Munn's initial motivation for the traffic stop was pretextual rather than on whether he had reasonable suspicion to justify prolonging the stop (R. 5 at 147-54.).

13

omitted).  Here, Munn had more than sufficient information upon which to base a reasonable suspicion, justifying his prolonging the traffic stop after the warning ticket had been issued and the checks on Simms' records had come back.  In fact, the information justifying prolonging the stop may have even furnished probable cause to search, *see California v. Acevedo*, 500 U.S. 565, 580 (1991), thereby rendering academic the concern about the validity of consent to search.

However, we will nonetheless examine whether Simms' consent was voluntary.  "A district court's determination that consent was voluntary is a finding of fact, that will not be disturbed on appeal absent clear error." *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001).  "In assessing voluntariness, the inquiry is factual and depends on the totality of the circumstances. . . . In evaluating the totality of the circumstances underlying consent, the court should look at several indicators, including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found." *Id.*

The district court found that Simms had freely consented to the search of his car.  Although Simms points out that his documents were returned only after he

14

had signed the consent form, he does not argue that his consent was coerced due to the retention of his documents. Nor did Simms withdraw his consent upon receiving his documents or at any point after the search had commenced. There is therefore no reason to disturb the district court's finding that Simms voluntarily consented to the search.

**2.**

The district court found, correctly, that the BOLO played no role in Munn's decision to initiate the traffic stop—in other words, Munn pulled Simms over for tailgating, not because Munn had received a BOLO for a car that matched the description of the one Simms was driving. However, the BOLO did play a role in Munn's decision to prolong the traffic stop after he had issued a warning ticket to Simms and had received confirmation of Simms' clean record. Munn testified at trial that he "would have probably asked [Simms] for consent regardless of that BOLO." (R. 5 at 160.) But since the BOLO contributed to Munn's decision to prolong the traffic stop and ask for consent to search, and since it stemmed from use of the tracking device outside of the geographical and/or jurisdictional limits set forth in the warrant authorizing it, it may be necessary to determine whether the search became tainted by wrongful use of the tracking device.

15

Although Simms does not claim a violation of Texas law, he has suggested that since the order authorizing use of the tracking device limited its use to the state of Texas, the use of information obtained from the device in Alabama "violated the scope of that warrant, and tainted all further activity by law enforcement." (Appellant's Br. at 13.) Texas law on the installation and use of mobile tracking devices provides that "[t]he remedies and sanctions described in this article are the exclusive judicial remedies and sanctions for a violation of this article other than a violation that infringes on a right of a party guaranteed by a state or federal constitution." Tex. Code Crim. Proc. Ann. art. 18.21, § 13 (2004). Even if we assume that the use of the tracking device beyond the bounds of the warrant may have violated Texas state law governing the installation and use of mobile tracking devices, this still leaves us several steps away from being able to reach a conclusion that suppression is warranted. As we have earlier noted, "constitutional considerations, rather than the demands of state law, direct our resolution of this issue." *United States v. Gilbert*, 942 F.2d 1537, 1541 (11th Cir. 1991). The use of the tracking device outside the scope of the warrant simply does not implicate federal constitutional concerns, and there is therefore no "taint" for purposes of applying the exclusionary rule. We find that the district court correctly denied Simms' motion to suppress.

16

**3.**

Last, Simms argues that, after the tracking device came to light, he should have been allowed to cross-examine Munn and Anderson, either by reopening the suppression hearing or at trial, because the officers had failed to mention the tracking device or the BOLO when they testified at the suppression hearing. "This court reviews a district court's denial of a defendant's

 motion to suppress under a mixed standard of review, reviewing the district court's findings of fact under the clearly erroneous standard and the district court's application of law to those facts de novo." *United States v. Desir*, 257 F.3d 1233, 1235-36 (11th Cir. 2001). We review for abuse of discretion the denial of a motion to reconsider. *See Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 454 (6th Cir. 2003). We review the district court's finding that the officers had not made prior inconsistent statements for an abuse of discretion. *United States v. Jones*, 913 F.2d 1552, 1564-65 (11th Cir. 1990).

Simms' apparent purpose in cross-examining the officers was "to challenge the factual basis of the stop of his vehicle" by generally impeaching their credibility with respect to allegedly inconsistent statements made at the suppression hearing. (Appellant's Br. at 45.) Simms concedes that the "factual

basis [for the stop of Simms' vehicle]" relates to the validity of the search and his suppression motion. (Appellant's Br. at 46.) However, these are legal issues within the province of the judge, not factual issues for the jury to decide at trial. There was therefore no reason to allow cross-examination of these witnesses at trial on this issue.

As for the suppression hearing, the district judge had already decided that there was no reason to reopen the suppression hearing or to reconsider the denial of the motion to suppress because the district court found that the officers had not made any inconsistent statements at the suppression hearing. (2/19/03 Order at 3-5.) A careful review of the transcript of the suppression hearing reveals no statements of either officer that are inconsistent with the existence of the BOLO and tracking device. No questions were asked that would have required the officers to reveal the existence of the BOLO or the tracking device.[9] The district court therefore did not abuse its discretion in finding that no inconsistent statements had been made, and it did not abuse its discretion in denying Simms' motion to suppress and his motion to reopen the suppression hearing.

---

[9]Although Simms' trial counsel asked Munn whether the traffic violation "was the only violation that [he was] aware of and the only criminal activity that [he] had reasonable suspicion regarding up until the time the cocaine was discovered" (R. 3 at 41), we have already noted that Munn's affirmative answer appeared to be due to a misunderstanding of the question as relating to a pretext for the traffic stop and does not indicate an inconsistency. *See* n.8, *supra*.

**C.**

Simms argues that, with respect to three pieces of *Brady* material, the district court either erroneously refused to require the government to make disclosures pre-trial or erroneously refused to grant a continuance when material was disclosed during trial, allegedly too late for Simms to effectively use it. Specifically, Simms refers to (1) the officers' collusion at the suppression hearing with respect to testimony about the tracking device and related items; (2) the identity of Oscar LNU and his criminal history (or, as it turned out, his lack thereof); and (3) the fact that persons other than Simms controlled the car exclusively for a period of between one and four days.

To establish a violation under *Brady v. Maryland*, 373 U.S. 83 (1963), a defendant must show that (1) the government possessed evidence favorable to the defendant; (2) the defendant did not possess the evidence and could not have obtained the evidence with reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defendant, there is a reasonable probability that the outcome would have been different. *United States v. Vallejo*, 297 F.3d 1154, 1164 (11th Cir. 2002) (internal citation omitted). Although Simms points out that the local rules of the Southern District

of Alabama require that *Brady* evidence be turned over at arraignment, S.D. Ala. L.R. 16.13(b)(1)(B), constitutional error results from the withholding of *Brady* evidence only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Scheer*, 168 F.3d 445, 451 (11th Cir. 1999) (citations omitted).

**1.**

Simms appears to argue that the officers' alleged collusion to omit testimony of the tracking device and related items at the suppression hearing was *Brady* evidence because it could have been used to impeach their credibility with respect to Simms' "guilty reactions" (Appellant's Br. at 47-48.) and with respect to whether the stop was pretextual. However, at some point between the suppression hearing and his unsuccessful pre-trial motion to reopen the suppression hearing, Simms apparently learned that the officers admitted that Fagan had told them to wait for a specific question before revealing the tracking device. (Appellant's Sealed Reply Br. at 5.) Since Simms obviously had this information in hand before trial, since he used it at trial to elicit from Fagan that he had advised the officers about how to testify at the suppression hearing and since Simms does not explain how he suffered any prejudice with respect to this information, there is no

20

*Brady* violation and no constitutional error. We have moreover already found that Munn's decision to stop Simms for tailgating was not pretextual.

**2.**

With respect to Oscar LNU's identity, Simms argues that the district court erred in failing to rule on his motion to compel and the government's responsive request for protective order until the first day of trial. Simms notes that the government had this information several weeks prior to trial, and that the court's eventual ruling indicates that the information was erroneously suppressed. He claims that "[b]ecause the defense learned this information piecemeal and in preparation of this brief, it could not effectively investigate it, utilize it in opening argument, or in the cross examination of Ruzzi." (Appellant's Br. at 53.) Simms' only explanation for why having this information earlier would have materially affected the outcome was that "it went directly to Simms'[ ] claim he lacked knowledge of the installation of the compartment and the drugs contained there." (Appellant's Br. at 52.) However, its only relevance to the key issue of Simms' knowledge is that it shows Simms did not obtain knowledge that the drugs were in his car by putting them there himself. Since the government never argued that Simms installed the secret compartment or put the cocaine into it (Gov't Sealed

21

Br. at 32.), the information is irrelevant. Moreover, Simms learned prior to opening statements that others had possession of the vehicle at some point while he was in the hospital in Houston and later argued that to the jury. For these reasons, he cannot demonstrate a "reasonable probability of a different result" had the information been disclosed earlier. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (citations omitted). His *Brady* claim as to this information therefore fails.[10]

**3.**

With respect to the length of time during which Simms' vehicle was exclusively possessed by Oscar Martinez and others, and to the fact that the possession may have lasted as long as four days, Simms says that this information was never disclosed to the defense, even though the defense strategy was to show that persons other than Simms had placed the cocaine in the vehicle without Simms' knowing it. However, Simms does concede that the district court told counsel that Oscar Martinez, the CI and law enforcement had access to the car exclusive of the defendant on September 23. And in closing argument, the *prosecution itself* argued that Oscar Martinez and his organization use secret

---

[10]Simms has also asked us to review all sealed documents for additional *Brady* material. We have done so, and have found none.

22

compartments in cars so that couriers can claim they didn't know there were drugs in the car. (R. 8 at 473-74.) Even if persons other than Simms may have had possession of Simms' car for longer than one day, Simms never explains why the length of time the vehicle was in the possession of others has any relevance to the present case or its outcome. The length of time during which Oscar LNU had exclusive possession of Simms' car is irrelevant because it does not bear on whether Simms knew that a secret compartment containing drugs had been put in his car.

**D.**

Simms argues that an evidentiary hearing should have been held with respect to "government wrongdoing" in initially suppressing the existence of and role played by the tracking device. Evidentiary rulings are reviewed for abuse of discretion. *United States v. Olson*, 697 F.2d 273, 275 (8th Cir. 1983).

The district court refused the defendant's request for an evidentiary hearing to examine allegations of misconduct by the officers and U.S. attorneys involved in this case with respect to the tracking device and refused to issue subpoenas for trial for the individuals in the U.S. Attorney's office who had known about the tracking device, holding that the issue was not proper for trial. The information

23

about the tracking device that may have been relevant to the present case was disclosed to Simms and a continuance granted so that he would have sufficient time to respond to the new information. The *reasons* for the delay in disclosing the tracking device are irrelevant to Simms' case, particularly if the use of the tracking device outside of Texas has no constitutional significance. As the district court correctly determined, Simms' allegations of misconduct are not a proper issue for trial. To the extent there was any government misconduct, it was rectified well before trial. The district court did not abuse its discretion in denying Simms the chance to divert the course of the trial away from his own misconduct.

**E.**

Simms argues that the government introduced part of the videotape of Simms' traffic stop in its case in chief but that Simms was erroneously prevented from playing the rest of the videotape (showing Fagan's arrival and his further questioning of Simms) under the rule of completeness because the district court found that showing the evidence from Fagan's perspective would be cumulative to what had already been seen. Simms argues this was error under Fed. R. Evid. 106, though he did not object at trial. We therefore review for plain error. *United States v. Jernigan*, 341 F.3d 1273, 1280 (11th Cir. 2003).

Rule 106 provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Fed. R. Evid. 106. However, "Rule 106 does not automatically make the entire document admissible. . . . It is consistently held that the rule permits introduction only of additional material that is relevant and is necessary to qualify, explain, or place into context the portion already introduced." *United States v. Pendas-Martinez*, 845 F.2d 938, 944 (11th Cir. 1988). Simms presents no basis upon which the introduction of the rest of the tape may be permitted under Fed. R. Evid. 106, and our review of the videotape does not provide one. We therefore find that the district court did not err in denying Simms the opportunity to play the remainder of the videotape.

**F.**

Simms argues that the district court erred in denying his motion to compel the government to turn over the actual tracking device and the information as to its use. Specifically, Simms argues that the device was obtained from the defendant and was therefore discoverable under Fed. R. Crim. P. 16(a)(1)(E), and he asserts that it was *Brady* evidence. However, even assuming *arguendo* that Fed. R. Crim.

25

P. 16(a)(1)(E) and/or Local Rule 16.13 required the production of the tracking device by the government, both the local rules and the federal rule permit the district court to deny discovery of a particular item. Fed. R. Crim. P. 16(d)(1) provides that "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." The local rules do not even require good cause; they simply allow that "[a]ny judge of this Court may suspend application and enforcement of these rules . . . . When any judge of the Court, in a specific action, issues any order which is not consistent with these rules, such order shall constitute a suspension of the rules with respect to that action only . . . ." S.D. Ala. L.R. 1.1(c)(4). Simms does not dispute that the government moved the district court for a protective order shielding the tracking device from discovery, and that the district court in response denied appellant's discovery request for the tracking device because Simms had made no showing of entitlement to the requested discovery. There was therefore no error.

IV.

The judgment is AFFIRMED.

26