[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-12985

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 28, 2011
JOHN LEY
CLERK

D.C. Docket No. 2:09-cr-00022-WKW-TFM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARTIN DEJESUS,
a.k.a. Martin Dejesus Perez,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(July 28, 2011)

Before DUBINA, Chief Judge, CARNES, Circuit Judge, and FORRESTER,[*]
District Judge.

PER CURIAM:

---

[*] Honorable J. Owen Forrester, United States District Judge for the Northern District of
Georgia, sitting by designation.

Martin DeJesus appeals his conviction for possessing with the intent to distribute five kilograms or more of cocaine powder in violation of 21 U.S.C. § 841(a)(1). DeJesus entered a conditional guilty plea, reserving the right to appeal the district court's denial of his motion to suppress the cocaine that was found in his vehicle. DeJesus contends that the district court erred in denying his motion to suppress because: (1) the traffic stop of his minivan was not based on a reasonable suspicion of criminal activity; (2) his detention following the traffic stop was unreasonably extended absent reasonable suspicion of criminal activity; (3) his consent to search his minivan was not freely given; and (4) the search of his vehicle exceeded the scope of any consent he may have given.

I.

On the morning of February 13, 2009, Alabama State Trooper Charlton Martin was patrolling the northbound side of I-65 in Montgomery County, Alabama, when he observed a white minivan with a temporary license plate traveling in the right-hand lane. Trooper Martin could only make out some of the numbers on the temporary tag, and he was unable to see whether it listed a state of origin or date of expiration. Because the minivan had a temporary paper license plate that was "just a piece of paper that you could print out . . . with your personal computer" and because he could not identify its state of origin, Martin initiated a

2

traffic stop of the vehicle in order to determine whether the temporary tag was being displayed in accordance with Alabama law.

As Martin approached the passenger side of the minivan, he noticed that the words "Texas Buyer" appeared on the temporary license plate in small print above the large-print license plate numbers. Once he arrived at the passenger-side window he met DeJesus, the driver and sole occupant of the vehicle. Martin asked DeJesus for his driver's license, informed him that he had been pulled over because he was not displaying a valid state license plate, and asked for paperwork to support the minivan's temporary tag. While DeJesus was retrieving the requested paperwork, Martin observed that DeJesus' hand was "visibly shaking." Martin, who was on the passenger side of the vehicle, also noticed that when he asked DeJesus for his driver's license he "shifted his body up against the driver's door, . . . creating distance between . . . law enforcement and himself."

From DeJesus' paperwork it appeared to Martin that the temporary license plate was valid and that it matched the minivan. While DeJesus was gathering the paperwork for the van and as Martin reviewed it, the two also engaged in conversation. Martin asked where DeJesus was headed, and DeJesus responded that he was traveling from Houston to Atlanta. Martin asked if he was going to Atlanta for work, and DeJesus responded that he was going to Atlanta "to live

3

there" and later explained that there was "no more work to do" in Texas so he was "moving to Atlanta" to work at a Cajun restaurant. During the course of that conversation, Martin interpreted DeJesus' apparent confusion in response to his questions about whether DeJesus was going to "move" to Atlanta and "live" there as an indication that DeJesus' "understanding of the English language was . . . selective" since DeJesus had already used those English words himself during the conversation.

Before returning to his patrol vehicle to further review DeJesus' paperwork, Trooper Martin looked inside the minivan and observed that the contents of the vehicle — a single suitcase, a duffel bag, a television, and a box of dishes — were in his opinion inconsistent with a permanent move to a new location. Once he was back in his patrol vehicle, Trooper Martin more closely scrutinized DeJesus' paperwork because in his experience there had been an increase in fraud as the technology used to produce fraudulent documents had become more widely available. Upon closer examination, Martin learned from the paperwork that DeJesus had purchased the minivan nine days earlier for just under $4000 in cash. Martin found it suspicious that DeJesus had very recently paid for the minivan in cash despite the fact that he was moving to Atlanta because he could no longer find work in Houston.

4

While in his patrol vehicle Martin also telephoned EPIC, the El Paso Intelligence Center, to inquire whether DeJesus had any outstanding warrants, any immigration issues, or whether he was involved in or wanted in connection with any open investigations. After a few minutes, Martin learned from EPIC that DeJesus was a possible suspect in an open drug trafficking investigation into an organization suspected of trafficking drugs from Houston to Boston. While Martin waited a few more minutes to learn if DeJesus was wanted in that or any other investigation, he typed out a warning citation for DeJesus' failure to plainly and visibly display a proper license plate. Once Martin learned that DeJesus was not wanted in the Houston drug trafficking investigation, he returned to the passenger side of DeJesus' minivan and leaned in through the window to return his driver's license and paperwork and to issue the warning citation.

After Martin explained to DeJesus that the warning citation was not a ticket and told him that the traffic stop was over, DeJesus thanked him. Immediately thereafter, Martin asked DeJesus, "May I, may I search your vehicle? You're not carrying anything illegal, are you?" DeJesus quickly responded "okay." Unconvinced that DeJesus had understood the question, Trooper Martin again asked for consent to search, this time in Spanish. DeJesus again responded, "okay." Before initiating the search, however, Trooper Martin asked DeJesus a

5

series of questions. First he asked, in Spanish, whether DeJesus had anything illegal in the van. DeJesus said "no" and laughed. Next Martin asked, in Spanish, whether DeJesus had any weapons. DeJesus said "no" several times but did not laugh. Then Martin asked, in Spanish, whether DeJesus had "mucho dinero" in the van. DeJesus again said "no" but did not laugh. Finally, Martin asked DeJesus, in Spanish, if he had any nails in the car.

Martin asked whether DeJesus had any nails in the car because in his experience "clavos," the Spanish word for nails, is a slang term for concealed compartments used to store contraband. Trooper Martin asked this question to gauge DeJesus' familiarity with the slang term. As Martin explained at the hearing on DeJesus' motion to suppress, "if I ask somebody if they have any nails in their car and they have no idea what the slang is and they're not a construction worker, I should get a puzzled look from them. But if they are familiar with the term, I will get a reaction that would indicate they are familiar with the term." When Martin asked DeJesus, "¿Tiene clavos en el carro?," DeJesus responded "Oh, no," followed by an extended laugh.

Following that exchange, Martin asked DeJesus once again, in Spanish, for consent to search his vehicle. When DeJesus again consented, Martin asked him to exit his vehicle and presented him with a consent-to-search form written in

6

Spanish. Martin pointed out various parts of the form to DeJesus, including both of their names, the signature line, and that the form covered both his car and his luggage. DeJesus signed the Spanish consent form, and Martin instructed him to wait in the patrol vehicle while the minivan was searched.

Martin began by searching for hidden compartments under the driver's seat. Finding none, he inspected the back of the minivan and looked inside the single piece of luggage and the box of dishes. Martin then checked the undercarriage of the minivan where he noticed a sliver of Bondo, a puddy-like material used in auto body repair, attached to "an aftermarket piece of sheet metal" that was connected to the minivan's rocker panel, an area running along the side of the vehicle from wheel well to wheel well. Recognizing the rocker panel as a place where contraband could be concealed, Martin opened the minivan's door and removed a piece of plastic from the area above the rocker panel, which allowed him to see inside the hidden compartment that had been formed by the sheet metal. Peering inside the compartment through some factory-made vent holes, Martin was able to see a piece of rope and some white packages.

Martin recognized the white packages as cocaine, alerted his fellow officers, and returned to his patrol vehicle where he read DeJesus his Miranda rights and placed him under arrest. After placing DeJesus under arrest, Martin and the other

7

troopers transported the minivan to the Department of Public Safety. Along the way, however, the officers' caravan stopped in the parking lot of the Montgomery Zoo where Martin allowed drug dogs to walk in and around the vehicle. Martin then used a portable video camera to show the hidden compartment as he had seen it during his roadside inspection. When the officers finally removed the contraband at the Department of Public Safety, they found five kilo-sized packages, which field-tested positive for cocaine.

## II.

When reviewing the denial of a motion to suppress evidence, we review the district court's findings of fact only for clear error and we review de novo its application of law to those facts. United States v. Ramirez, 476 F.3d 1231, 1235 (11th Cir. 2007). In addition, "all facts are construed in the light most favorable to the party prevailing in the district court — in this case, the government." Id. at 1235–36.

DeJesus contends that the district court erred in denying his motion to suppress the cocaine because the search of his minivan was tainted by an unlawful traffic stop. He argues that Trooper Martin's decision to stop his vehicle was premised on a mistake of law, which cannot form the basis of a legal traffic stop.

It is well-settled that "the police may stop and briefly detain a person to investigate a reasonable suspicion that he is involved in criminal activity, even though probable cause is lacking." United States v. Williams, 876 F.2d 1521, 1523 (11th Cir. 1989). Whether an officer has reasonable suspicion to believe that criminal activity is afoot is to be "determined from the totality of the circumstances . . . and from the collective knowledge of the officers involved in the stop." United States v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999) (quotation marks and citations omitted). Furthermore, a "traffic stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment." United States v. Chanthasouxat, 342 F.3d 1271, 1276 (11th Cir. 2003). A mistake of law, on the other hand, "no matter how reasonable or understandable, . . . cannot provide reasonable suspicion or probable cause to justify a traffic stop." Id. at 1279.

DeJesus argues that he was unlawfully stopped based on Trooper Martin's mistake of law regarding the requirements for the display of temporary license plates in Alabama. Section 32-6-51 of the Alabama Code provides that "[e]very motor vehicle operator who operates a motor vehicle . . . in this state shall at all times keep attached and plainly visible on the rear end of such motor vehicle a license tag or license plate as prescribed and furnished by the Department of

9

Revenue . . . ." Ala. Code § 32-6-51. DeJesus argues that Trooper Martin's mistake of law was pulling him over based on the mistaken belief that he was in violation of Alabama law despite the fact that § 32-6-51 requires only that a license plate be "plainly visible" and not that the state of origin be legible from a distance or that the car's registration be immediately verifiable.

However, § 32-6-51 also requires a vehicle to display a "plainly visible . . . license plate <u>as prescribed and furnished by the Department of Revenue</u>." Ala. Code. § 32-6-51 (emphasis added). As Trooper Martin testified at the suppression hearing, he was unable to tell from a distance whether DeJesus' temporary license plate was in compliance with § 32-6-51 because he could not make out all of the information on the license plate and because temporary tags such as the one on DeJesus' minivan look like "a piece of paper that you could print out . . . with your personal computer." And if DeJesus had in fact fabricated his own temporary license plate using a personal computer, such an invalid tag would have constituted a traffic violation under Alabama law. Therefore, based on the totality of the circumstances including his training and experience, Trooper Martin had a reasonable suspicion that DeJesus was in violation of § 32-6-51 for failure to display a "plainly visible . . . license plate as prescribed and furnished by the Department of Revenue."

10

Although DeJesus points out that his temporary license plate was valid under Alabama and Texas law based on reciprocity agreements concerning the use and display of temporary tags, Trooper Martin's mistaken belief about DeJesus' compliance with the law was ultimately a mistake of fact. And because Martin's mistaken belief that DeJesus was driving with an invalid temporary license plate was reasonable, the mistake of fact did not make the initial stop improper.

III.

DeJesus contends that even if the initial stop was proper, the cocaine nevertheless should have been suppressed because the search of his minivan was tainted by the fact that Trooper Martin extended his roadside detention longer than was necessary to complete the traffic stop.

Generally, a traffic stop must last "no longer than is necessary to effectuate the purpose of the stop," and "the scope of the detention must be carefully tailored to its underlying justification." Pruitt, 174 F.3d at 1220 (quotation marks and alteration omitted). Even so, an officer may lawfully ask questions unrelated to the traffic stop, examine a driver's license, or perform computer checks of a driver's license and vehicle registration so long as the officer does not unreasonably prolong the duration of the stop. United States v. Hernandez, 418 F.3d 1206, 1209 n.3 (11th Cir. 2005). "Ordinarily, when a citation or warning has

11

been issued and all record checks have been completed and come back clean, the legitimate investigative purpose of the traffic stop is fulfilled." United States v. Simms, 385 F.3d 1347, 1353 (11th Cir. 2004). However, a traffic stop may last longer than the purpose of the stop would ordinarily permit if an officer, based on specific facts and rational inferences drawn from those facts in light of his training and experience, has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring. Pruitt, 174 F.3d at 1220; United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990).

DeJesus argues that he was unreasonably detained because even if the traffic stop was lawful it should have terminated once Trooper Martin learned that his tag was valid. DeJesus asserts that Martin had decided to search his vehicle almost as soon as he pulled him over and then unreasonably detained him without justification. We disagree.

Once Martin executed a valid traffic stop based on his reasonable suspicion that DeJesus' temporary tag was not in compliance with Alabama law, it was not unreasonable for him to detain DeJesus for the next 15 – 20 minutes to verify that the temporary tag was leigitmate. While doing so, Martin permissibly inquired about DeJesus' destination and the purpose of his trip, verified his vehicle's registration, and returned to his patrol car to more closely review the paperwork

12

relating to the tag. The legitimate investigative purpose of the stop was not completed until Martin returned to DeJesus' vehicle with a warning citation and informed him that the traffic stop was over.

DeJesus' roadside detention was not unreasonably prolonged by the fact that Martin telephoned EPIC to find out if DeJesus was wanted in Texas. After the lawful traffic stop, Martin through his training and experience as a law enforcement officer had developed a reasonable suspicion that DeJesus could be involved in drug trafficking. In the short time that DeJesus was detained on the side of the road, Martin had observed that (1) DeJesus appeared more nervous than the average subject of a traffic stop; (2) he was traveling from Houston to Atlanta, a major drug-trafficking corridor; (3) his paperwork indicated that he had purchased the minivan for almost $4,000 in cash just nine days before the traffic stop, but he said that he was moving because he had been unable to find work; and (4) the items in his vehicle were inconsistent with someone making a permanent move to a new location. These facts, taken together, provided Martin with reasonable suspicion that DeJesus was involved in illegal conduct, justifying more detention to investigate the presence of contraband. See United States v. Bautista-Silva, 567 F.3d 1266, 1272 (11th Cir. 2009) (providing that police officers may draw on their experiences and specialized training to make inferences and

13

deductions that might elude an untrained person); <u>United States v. Lee</u>, 68 F.3d 1267, 1271 (11th Cir. 1995) (providing that none of a defendant's actions need to be criminal on their face in order to justify a prolonged detention so long as all of his actions taken together could give rise to reasonable suspicion in the mind of a trained officer).

IV.

DeJesus also contends that even if the initial stop was lawful, and even if his longer detention was justified, the cocaine still should have been suppressed because he did not voluntarily consent to the search of his minivan. He argues that he was subjected to coercive conditions, including accusations of wrongdoing and the officers' show of authority, which rendered his consent to search involuntary.

"One of the well-established exceptions to the [Fourth Amendment's] probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent." <u>United States v. Garcia</u>, 890 F.2d 355, 360 (11th Cir. 1989). Courts look to several factors in order to determine whether a defendant's consent to search was voluntary, "including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and

intelligence, and the defendant's belief that no incriminating evidence will be found." Purcell, 236 F.3d at 1281. We review a district court's finding that consent was voluntary only for clear error. United States v. Simms, 385 F.3d 1347, 1355 (11th Cir. 2004).

DeJesus argues that a reasonable person would not have felt free to drive away because because Trooper Martin was leaning into the passenger-side window of his minivan. Despite DeJesus's contention, there is no indication that his consent was coerced. Martin leaned into the passenger-side window of DeJesus' minivan to return his paperwork and issue the warning citation. At that time, he informed DeJesus that the traffic stop was over and immediately asked for his consent to search the vehicle. While two other officers and two police dogs were also on the side of the road at the time that DeJesus consented to the search, their presence did not constitute a show of force that would render his consent involuntary. Lest there be any doubt, Martin confirmed DeJesus' consent by asking in English, then in Spanish, then again in Spanish following a series of questions, and finally by asking him to sign a Spanish-language consent form, which also informed DeJesus that he could freely refuse his consent. Every time, DeJesus consented.

It is undisputed that Trooper Martin had returned DeJesus's paperwork,

issued him a warning, and told him the traffic stop was over before asking him if he had anything illegal in the car. At that point, DeJesus' roadside detention turned into a consensual encounter that a reasonable person would have felt free to terminate. Considering the totality of the circumstances, the district court did not clearly err in determining that DeJesus voluntarily consented to the search of his vehicle.

V.

DeJesus also contends that the search was invalid because the scope of it exceeded his consent. "A consensual search is manifestly reasonable so long as it remains within the scope of the consent," United States v. Martinez, 949 F.2d 1117, 1119 (11th Cir. 1992), and whether any limitations were placed on the scope of consent is determined by the totality of the circumstances, United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989). Where no limits are placed on the scope of consent, a search is constrained only "by the bounds of reasonableness." United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991). Furthermore, "[a] general consent to search for specific items includes consent to search any compartment or container that might reasonably contain those items." Zapata,180 F.3d at 1243.

The district court correctly determined that the search did not exceed the

16

scope of the consent to search.  Because there is no evidence that DeJesus limited his consent in any way, the permissible scope of the search was limited only by the "bounds of reasonableness," Harris, 928 F.2d at 1117, and it was reasonable for Trooper Martin to search any compartment within the vehicle where narcotics might be found, Zapata,180 F.3d at 1243.  When Martin discovered the three white packages tied with rope behind the minivan's rocker panels, he had probable cause to seize, relocate, and conduct further searches of the vehicle.  See United States v. Virden, 488 F.3d 1317, 1321 (11th Cir. 2007) (providing that police may lawfully seize a vehicle if probable cause exists to believe the vehicle contains contraband).  The district court correctly denied DeJesus' motion to suppress.

**AFFIRMED.**[1]

---

[1] This case was originally docketed for oral argument, but the panel unanimously determined to decide it based on the briefs.  See 11th Cir. R. 34–3(f).