[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-12790

_____

D. C. Docket No. 4:11-cr-00022-RLV-WEJ-3

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JASON VOTROBEK,
ROLAND CASTELLANOS,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

(February 13, 2017)

Before WILSON and JULIE CARNES, Circuit Judges, and ROYAL,[*] District
Judge.

_____

[*]Honorable C. Ashley Royal, United States District Judge for the Middle District of Georgia,
sitting by designation.

ROYAL, District Judge:

A jury convicted Appellants Jason Votrobek and Roland Castellanos of conspiring to distribute drugs, in violation of 21 U.S.C. § 846; conspiring to launder money, in violation of 18 U.S.C. § 1956(h); and substantive charges of money laundering and maintaining a place for unlawful drug distribution. The district court sentenced both to 180 months in confinement, followed by three years of supervised release. Appellants challenge their convictions. After careful review, we **AFFIRM**.

## BACKGROUND

Appellants' convictions center on their involvement in a "pill mill" business.[1] Appellants learned how to operate a pill mill clinic from Zachary Rose, who owned and operated three clinics in Jacksonville, Florida. Indeed, Appellants met each other while working on the staff at one of these clinics, Jacksonville Pain and Urgent Care (Jacksonville Pain). However, once law enforcement began to investigate Rose's Florida clinics in early 2010, Appellants left Jacksonville Pain and established their own clinic, Atlanta Medical Group (AMG) in Cartersville, Georgia. AMG soon hired Dr. James Chapman as its prescribing physician.

Appellants operated AMG in the fashion typical of pill mills. Generally, AMG patients would pay about $300 in cash for a cursory examination by Dr.

---

[1] A "pill mill" is a term used to describe a medical clinic that prescribes narcotics for illegitimate purposes.

2

Chapman, whose prescriptions for pain medications were processed by AMG's in-house pharmacy. To pass drug tests, patients frequently brought balloons containing urine and bribed AMG staff. Security guards searched patients for weapons. Moreover, Appellants charged more for prescriptions than AMG's books reflected and purchased luxury vehicles with the undocumented cash.

As is also typical of these operations, nearby tenants soon began to complain to AMG's landlord that unkempt patients arrived before business hours in cars with out-of-state license plates and loitered in the parking lot. Local pharmacies refused to fill AMG's prescriptions because the patients did not appear to be in any pain. In May 2010, after a traffic stop of four AMG patients carrying large amounts of prescription narcotics, the Drug Enforcement Administration (DEA) began investigating AMG.

Although Appellant Votrobek had left Florida to open AMG in Georgia, his involvement in Rose's Florida clinics caught up with him. On April 20, 2012, in the Middle District of Florida, a Grand Jury indicted Votrobek for conspiracy to distribute Oxycodone and Alprazolam not for a legitimate medical purpose and conspiracy to launder money. After a fifteen-day trial, however, a jury found Votrobek not guilty.

Votrobek's respite from conviction was fleeting. Less than two months after his acquittal in Florida, on June 25, 2013, a Grand Jury in the Northern District of

3

Georgia returned a thirty-two count indictment against Appellants Votrobek and Castellanos, as well as Dr. Chapman, regarding their involvement in AMG. Pertinent to this appeal, the indictment charged Appellants with conspiracy to distribute Oxycodone, Hydrocodone with Acetominophen (Lorcet), and Alprazolam (Xanax) for other than a legitimate medical purpose; conspiracy to launder money; and substantive counts of money laundering and maintaining a place for unlawful drug distribution.

After almost four weeks of trial, a jury convicted Appellants on all counts.[2] The district court sentenced each to a total of 180 months in prison, followed by three years of supervised release. Additionally, each was required to pay $200,000 in fines and forfeit to the United States a monetary judgment in the amount of $3,975,308.

On appeal, Votrobek and Castellanos each raise two issues. Votrobek argues the district court (1) committed plain error by not dismissing the Georgia conspiracy charges on Double Jeopardy grounds, and (2) assuming the conspiracy charges were barred by Double Jeopardy, committed plain error by not dismissing his substantive convictions based on prejudicial spillover. Castellanos argues the district court (1) erred by refusing to hold an evidentiary hearing concerning the affidavits supporting the four wiretaps, and (2) abused its discretion by refusing to

---

[2] The jury also convicted Dr. Chapman.

4

instruct the jury on the entrapment-by-estoppel defense. For the reasons set forth below, we affirm both convictions.

## DISCUSSION

### I. Double Jeopardy

Votrobek first argues his conspiracy charges in the Northern District of Georgia arose from the same conspiracy for which he was acquitted in the Middle District of Florida and thus are barred by the Double Jeopardy Clause. We disagree.

Because Votrobek failed to raise this argument below, he forfeited his right to a Double Jeopardy defense, and we review for plain error. *United States v. Lewis*, 492 F.3d 1219, 1222 (11th Cir. 2007) (en banc). Under this standard, an appellant must establish "(1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005) (quoting *United States v. Cotton*, 535 U.S. 625, 631, 122 S. Ct. 1781, 1785 (2002)). If the appellant meets all three conditions, "an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

The Double Jeopardy Clause of the Fifth Amendment provides "[n]o person shall . . . be subject for the same offen[s]e to be twice put in jeopardy of life or limb." U.S. Const. amend V. Specifically, the Double Jeopardy Clause protects

5

against (1) "a second prosecution for the same offense after acquittal"; (2) "a second prosecution for the same offense after conviction"; and (3) "multiple punishments for the same offense." *Brown v. Ohio,* 432 U.S. 161, 165, 97 S. Ct. 2221, 2225 (1977) (internal quotation marks omitted). The Clause, however, does not "forbid a second prosecution involving a violation of exactly the same law." *United States v. Maza*, 983 F.2d 1004, 1011 (11th Cir. 1993). Accordingly, "[w]hether a defendant has committed the same offense twice is a factual question" requiring a "determination that the underlying facts that gave rise to the first prosecution are, or are not the sole basis for the second." *Id.*

Thus, to determine whether Votrobek's conviction violated Double Jeopardy, we must decide whether he committed two separate conspiracies in Florida and Georgia or only one. To do so, we consider five factors: "(1) time, (2) persons acting as co-conspirators, (3) the statutory offenses charged in the indictments, (4) the overt acts charged by the government or any other description of the offense charged which indicates the nature and scope of the activity which the government sought to punish in each case, and (5) places where the events alleged as part of the conspiracy took place." *United States v. Marable*, 578 F.2d 151, 154 (5th Cir. 1978).[3] Using these factors, the government bears the burden of proving a separate conspiracy by a preponderance of the evidence. *Maza*, 983 F.2d

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), we adopted as binding precedent all cases decided by the former Fifth Circuit before October 1, 1981.

at 1013. In this analysis, we are free to consider the record in addition to the indictments. *Marable*, 578 F.2d at 154; *see also United States v. Benefield*, 874 F.2d 1503, 1506 (11th Cir. 1989).

Applying the *Marable* factors to this case, we conclude the government has shown Votrobek committed two separate conspiracies, one in Florida and one in Georgia. First, the Florida and Georgia conspiracies did not overlap in time. A temporal gap between the end of one conspiracy and the beginning of another indicates separate conspiracies. *See United States v. Sturman*, 679 F.2d 840, 844 (11th Cir. 1982). Here, Votrobek ended his involvement in the Florida conspiracies in April 2010, one month before the Georgia conspiracies began.[4]

Second, Votrobek's different co-conspirators in Florida and Georgia indicate separate conspiracies. The only named participant the conspiracies had in common was Votrobek himself.[5] As we have previously noted, the participation of a single common actor fails to establish the existence of a single conspiracy. *See United*

---

[4] Although Votrobek argues the conspiracies briefly overlapped from May through July of 2010 based on the time periods set forth in the indictments, at trial three witnesses testified that Votrobek left the Florida conspiracy in April 2010. Moreover, in Votrobek's response to the government's 404(b) notice, he asserted that as of April 19, 2010, he had "intentionally severed ties with" and "had absolutely no involvement with" Rose's Florida clinics. Doc. 162 at 3.

[5] The Florida indictment named twelve co-conspirators in addition to Votrobek: Zachary Rose, Dr. Hall, Dr. Perla, Dr. Tafflin, Dr. Posca, Dr. Brandt, Krystopher Legg, Ryan Young, Yevgeny Drubetskoy, Theodore Enquist, Brian Goldberg, and Theresa Faulker. In Georgia, the named indicted co-conspirators were Votrobek, Castellanos, Jesse Violante, Tara Atkins, and Dr. Chapman, while the named undicted co-conspirators were Kim Bovino, John Cendor, Jamie Priest, Cheryl Votrobek, David Votrobek, Dr. Locke, Dr. Efobi, Dr. Daniachew, Dr. Nortick, and Timothy Spurlock. Although Castellanos worked at the Florida clinic before joining Votrobek in Georgia, "the identity of unindicted persons is inconsequential for this double jeopardy analysis." *Sturman*, 679 F.2d at 843.

7

*States v. Nino*, 967 F.2d 1508, 1511—12 (11th Cir. 1992) (citing *Kotteakos v. United States*, 328 U.S. 750, 754—55, 66 S. Ct. 1239, 1242—43 (1946)). Indeed, the absence of co-conspirators charged in both indictments indicates "two distinct conspiracies." *Sturman*, 679 F.2d at 843. Moreover, the linchpin of the Georgia conspiracy was Dr. James Chapman, whose participation allowed AMG to distribute controlled narcotics. Yet Dr. Chapman did not participate in the Florida conspiracy. The fact that certain patients patronized both the Florida and Georgia clinics is irrelevant because no patients were co-conspirators. We agree with the government that the evidence indicates Votrobek learned the pill mill business in Florida, then left to start AMG in Georgia with new co-conspirators.

Third, although the offenses charged in both indictments were almost identical, this factor is not controlling. We have previously explained "it is possible to have two different conspiracies to commit exactly the same kind of crime." *Nino*, 967 F.2d at 1512. Accordingly, we have described this factor as "clearly" the least important to the *Marable* analysis. *See Sturman*, 679 F.2d at 843. Moreover, although both indictments alleged violations of 21 U.S.C. § 846 and 18 U.S.C. § 1956(h), the controlled substances alleged in each drug conspiracy differed somewhat. Whereas the Florida indictment alleged only Oxycodone and Alprazolam (Xanax), the Georgia indictment also alleged Hydrocodone with

8

Acetaminophen (Lorcet), indicating Votrobek distributed an additional drug in Georgia.

Fourth, the Florida and Georgia conspiracies involved similar but different overt acts. Different overt acts indicate separate conspiracies. *See United States v. Nyhuis*, 8 F.3d 731, 737—38 (11th Cir. 1993). Even if the overt acts charged are superfluous, they "serve to describe the offense charged," and thus, "we may examine them for the additional insight they provide into the nature and scope" of the conspiracies. *Marable*, 578 F.2d at 155.[6] According to the Florida indictment, the conspirators distributed controlled substances without adequate examinations or treatment plans, solicited out-of-state patients, required $250 or $300 cash payments, referred patients to a certain individual who provided magnetic resonance images, allowed patients to evade drug tests, and made daily cash deposits in various Jacksonville banks. These overt acts were conceptually similar to but objectively different from those in Georgia, which included purchasing and selling excessive quantities of controlled substances, monitoring law enforcement actions against similar clinics, allowing AMG employees to accept bribes from drug addicts, and using proceeds to purchase additional controlled substances. That AMG utilized the same startup plan, hiring process, and policies and procedures as

---

[6] We note that the government is not required to prove an overt act under 21 U.S.C. § 846. *United States v. Shabani*, 513 U.S. 10, 11, 115 S. Ct. 382, 383 (1994). Because the indictment in this case included numerous overt acts, we consider them in our *Marable* analysis.

the Florida clinics is unsurprising, as Votrobek and Castellanos carried their knowledge of the pill mill business with them from Florida to Georgia. Thus, although similar, the overt acts in Florida and Georgia were different.

Finally, the fifth *Marable* factor strongly suggests the existence of two separate conspiracies because the conspiracies took place in two different states. Indictments alleging "the conspiratorial events occurred in separate places," indicate separate conspiracies. *Sturman*, 679 F.2d at 843. Here, the Florida conspiracy revolved around three clinics in Jacksonville, Florida. In contrast, the Georgia conspiracy focused on AMG in Cartersville, Georgia. Indeed, the Georgia indictment is silent as to any of Votrobek's activities in Florida, while the Florida indictment only briefly notes Votrobek left Florida "to open his own pain management clinic" in Georgia. Doc. 340 at 6. Although Votrobek argues both the Florida and Georgia clinics catered to patients from Tennessee, Kentucky, and Ohio, none of the events alleged as part of either conspiracy took place in these states. The origin of the clinics' clientele does not establish the conspiracies occurred in the same place.

Based on (1) the absence of temporal overlap, (2) the lack of any common co-conspirators, (3) the additional substances distributed in Georgia, (4) the different overt acts, and (5) the entirely separate locations of the clinics, we conclude the government has established the existence of two separate

conspiracies. Hence, Votrobek's conviction is not barred by the Double Jeopardy Clause. At the very least, we cannot say the district court committed plain error by failing to dismiss the Georgia conspiracy charges on Double Jeopardy grounds.

Finally, as to Votrobek's second enumeration of error, because his conspiracy charges did not violate the Double Jeopardy Clause, there was no prejudicial spillover as to his substantive charges. Thus, we need not address his argument on this issue.

## II. District Court's Refusal to Hold a *Franks v. Delaware* Hearing

We now turn to Appellant Castellanos' two enumerations of error. Castellanos first argues the district court erred in denying his request for a *Franks* hearing pursuant to *Franks v. Delaware,* 438 U.S. 154, 98 S. Ct. 2674 (1978), based on certain alleged false statements in the affidavits used to obtain court authorization for telephone wiretaps. We disagree.

To challenge the veracity of an affidavit in support of a wiretap order under *Franks*, a defendant must make "a substantial preliminary showing" that (1) "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and (2) "the allegedly false statement is necessary to the finding of probable cause." *Franks,* 438 U.S. at 155–56, 98 S. Ct. at 2676. "Allegations of negligence or innocent mistake are insufficient," and the defendant's "attack must be more than conclusory and must

11

be supported by more than a mere desire to cross-examine." *Id.* at 171, 98 S. Ct. at 2684. Upon such a showing, the defendant is entitled to an evidentiary hearing on the issue. *Id.* at 155, 98 S. Ct. at 2676. Although we have not articulated the precise standard to review a district court's denial of a *Franks* hearing, normally a district court's decision regarding the need for an evidentiary hearing is reviewed for abuse of discretion. *United States v. Arbolaez,* 450 F.3d 1283, 1293 (11th Cir. 2006) (per curiam). We will apply that standard here.

Here, the United States submitted wiretap applications on February 16, March 18, April 19, and June 6, 2011. In the supporting affidavits, DEA Special Agent Lourdes M. Bowen averred that in May of 2010, the DEA identified AMG as a pill mill after receiving complaints from the public concerning AMG's high volume of patients. During a traffic stop of four patients, agents discovered large amounts of controlled narcotics. Over the course of the investigation, agents interviewed three AMG patients, who all described receiving Oxycodone prescriptions after perfunctory exams performed by Dr. Chapman. For example, one patient met with Dr. Chapman for no more than twenty-five minutes, during which time he merely asked her to bend over, touch her toes, and move her legs against resistance, before prescribing pills. Based on this information, agents interviewed Dr. Steven Lobel, a medical doctor, who stated new patient examinations should include assessments of cranial nerves, concentration, speech,

12

reflex, and sensation. Further, Dr. Lobel opined that the large doses of Oxycodone reflected "callous disregard for legitimate prescribing." TT-1 Aff. ¶ 27.

Additionally, agents interviewed three former AMG employees, who all indicated the clinic initially accepted only cash payments. One former employee explained patients might pay up to $1,200 per visit, and she once collected approximately $22,000 in cash in a two-hour period. According to the same employee, patients arrived in groups of three to five, often in the same vehicle, and occasionally bribed AMG staff to let them pass drug screens. The employee found discarded condoms, bottles, and balloons in the restroom, but the office manager told her it was none of her business. Further, Castellanos instructed AMG nurses to search patients for weapons.

In a consensually recorded telephone conversation with a confidential source, Votrobek confided he could not sleep at night because he feared he would watch his child grow up from behind bars, repeatedly mentioned Zachary Rose's Florida clinics, and discussed AMG's sophisticated security systems. Moreover, he asserted AMG was not a pill mill because it did not process 120 patients per day or allow patients to sell pills in the parking lot. Based on Votrobek's explicit contradiction of these details typical of pill mills, Agent Bowen concluded Votrobek was identifying ways to avoid raising suspicion at a pill mill.

13

Finally, Agent Bowen explained why the wire intercepts were necessary to the investigation. Prior to seeking the wiretaps, agents had utilized toll-record analysis, financial transaction reports, confidential informants and sources, interviews with AMG patients and former employees, physical surveillance, video surveillance, GPS trackers, and trash searches; however, these investigative techniques had failed to reveal the knowledge and intent of the conspirators. According to Agent Bowen, AMG's owners had become more guarded as the investigation progressed and had stopped communicating with two of the confidential sources. Agent Bowen believed other confidential sources or undercover agents would be unlikely to interact with those at the upper echelons of the conspiracy. Similarly, physical surveillance and pole cameras had only allowed agents to observe Dr. Chapman's visits to a nearby liquor store and patients arriving and departing from the clinic. Finally, techniques such as surveillance and searches of the owners' residences, interviews, and grand jury subpoenas would immediately alert the conspirators to the investigation.

Castellanos argues Agent Bowen had no basis to conclude (1) the four patients in the initial traffic stop possessed large amounts of controlled narcotics, and (2) AMG wrote prescriptions without sufficient medical reason based on inadequate examinations performed by AMG physicians. Castellanos contends both statements constitute unfounded medical opinions because Agent Bowen

14

lacked medical training. These arguments are unfounded. Agent Bowen averred that after interviewing multiple patients, she conferred with Dr. Steven Lobel, who opined that AMG physicians prescribed narcotics in "relatively large quantities" and did not perform proper neurological and physical examinations. TT-1 Aff. ¶ 27. Hence, we conclude Agent's Bowen's statements were "supported by substantial evidence" and thus were not knowingly and intentionally false or in reckless disregard of the truth. *See O'Ferrell v. United States*, 253 F.3d 1257, 1269—70 (11th Cir. 2001).

Castellanos' next argument—that Agent Bowen misrepresented Votrobek's statements during the consensually recorded phone call—also fails. Castellanos argues Agent Bowen had no basis to conclude Votrobek was identifying ways to avoid raising suspicion at a pill mill because Votrobek explicitly stated AMG did not see 120 patients per day or allow patients to sell pills in the parking lot. Based on Agent Bowen's considerable experience investigating drug trafficking, however, Votrobek's explicit contradiction of details typical of pill mill operations supported her conclusion Votrobek was identifying ways to avoid raising suspicion, especially considering Votrobek knew the conversation was being recorded. Thus, we cannot say Agent Bowen's statement was either knowingly and intentionally false or in reckless disregard for the truth.

15

Finally, Castellanos argues Agent Bowen made only conclusory statements supporting the wiretap's necessity. A wiretap order requires a showing that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). This necessity requirement ensures "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime," but it does not require "a comprehensive exhaustion of all possible investigative techniques." *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1214 (11th Cir. 2010). As set forth above, Agent Bowen spends nearly 24 pages supporting each affidavit detailing the multiple investigatory techniques utilized by law enforcement and explaining why they were unlikely to reveal the knowledge and intent of the targets.

Castellanos has failed to make a substantial showing that Agent Bowen's statements were knowingly and intentionally false or made in reckless disregard for the truth. Nor has Castellanos shown the affidavit lacked probable cause absent the challenged material. Accordingly, the district court did not abuse its discretion by refusing to hold a *Franks* hearing.

## C. District Court's Refusal to Give Requested Instruction on Entrapment by Estoppel

Castellanos next argues the district court erred in denying his request to instruct the jury on the entrapment-by-estoppel defense.

We review a district court's refusal to give a requested "theory of defense" instruction for abuse of discretion. *United States v. Chastain*, 198 F.3d 1338, 1350 (11th Cir. 1999). Such a refusal is reversible error only if the requested instruction "(1) was a correct statement of the law; (2) was not adequately covered in the instructions given to the jury; (3) concerned an issue so substantive that its omission impaired the accused's ability to present a defense; and (4) dealt with an issue properly before the jury." *United States v. Westry*, 524 F.3d 1198, 1216 (11th Cir. 2008) (per curiam) (internal quotation marks omitted). The instruction must have "legal support" and "some basis in the evidence." *United States v. Morris*, 20 F.3d 1111, 1114—15 (11th Cir. 1994) (internal quotation marks omitted). Thus, a district court "has authority to refuse to instruct the jury on a defense where the evidence used to support it, if believed, fails to establish a legally cognizable defense." *United States v. Billue*, 994 F.2d 1562, 1568 (11th Cir. 1993).

Although ignorance of the law generally is no defense, "[e]ntrapment-by-estoppel is an affirmative defense that provides a narrow exception" to this rule. *United States v. Funches*, 135 F.3d 1405, 1407 (11th Cir. 1998). Entrapment by

17

estoppel "applies to a defendant who reasonably relies on the assurance of a government official that specified conduct will not violate the law." *United States v. Alvarado*, 808 F.3d 474, 484—85 (11th Cir. 2015). Thus, the defense "requires a showing that a government official affirmatively communicated to the defendant the official's approval of the conduct at issue." *Id.* at 485. Reliance on the official's statement must be "objectively reasonable" in light of "the identity of the official, the point of law represented, and the substance of the misrepresentation." *Funches*, 135 F.3d at 1407. Accordingly, when entrapment by estoppel is "asserted as a defense to a federal crime," the defendant must show "reliance on a misstatement by an official or agent of the federal government." *Id.*

Here, Castellanos requested an entrapment-by-estoppel jury instruction based on the testimony of Georgia Bureau of Investigation Agent Kenneth Howard. According to Agent Howard, in July 2010, he received a phone call from Castellanos, who volunteered that AMG had received complaints from local pharmacies, acknowledged the clinic's out-of-state patients raised red flags, assured Agent Howard that AMG was a legitimate business, and asked whether AMG was under investigation. When asked whether he told Castellanos that law enforcement considered out-of-state patients to be red flags, Agent Howard answered, "No, I didn't volunteer anything. I was very cautious with that conversation. He did most of the talking, and he volunteered that." Doc. 361, at

18

146. Agent Howard reiterated that he did not advise AMG they were violating the law because "that would be contradictory to [the] investigation." Doc. 362, at 80. Subsequently, Tara Atkins met with DEA agents on multiple occasions, but no testimony was given as to what, if anything, the agents told her.

We conclude that the issue of entrapment by estoppel was not properly before the jury. At no point did any witness testify that Agent Howard or the DEA agents affirmatively communicated to Castellanos or Atkins that AMG's conduct was in compliance with the law. Therefore, the requested instruction had no factual basis in the evidence. Moreover, as an employee of a state agency, Agent Howard had no authority to bind the federal government to any erroneous interpretation of federal law. As a result, the requested instruction lacked legal support. Accordingly, the district court did not abuse its discretion by refusing to instruct the jury on entrapment by estoppel.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** Appellants' convictions.