[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-14142
_____

D.C. Docket No. 1:18-cr-20743-RAR-2


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TARRESSE LEONARD,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(July 8, 2021)

Before MARTIN, GRANT, and BRASHER, Circuit Judges.

GRANT, Circuit Judge:

A defendant must know that he is a felon in order to be convicted under 18

U.S.C. § 922(g) as a felon in possession of a firearm.  This case requires us to

decide whether an indictment that does not clearly set out that element warrants an

automatic presumption of prejudice to the defendant.  It does not.  That kind of

error is not the sort of structural infirmity that infects the entire trial, so we review it using the same harmless-error inquiry that applies to most other types of errors, including constitutional ones. Here, any potential error in the indictment was harmless. Finding no other errors in the conviction or sentence, we affirm.

## I.

Emanuel Jackson, firearm by his side, walked toward a small crowd of people gathered near a street corner. As Jackson closed in, Detective Paul-Noel, onsite for an unrelated investigation, saw him raise the firearm to eye level and point the gun at the crowd. Chaos followed, as the people on the corner screamed and shouted, hurrying to get out of Jackson's way. Without firing a shot, Jackson tucked the gun into his waistband and walked back across the street, where he joined two other men—Tarresse Leonard and Dexter Franklin.

Realizing that he was in an emergency situation, Detective Paul-Noel put on a bulletproof vest and called for backup. One detective was close by; together, and with their badges prominently displayed, the detectives approached the three men, who started to run as soon as they realized what was going on. The detectives yelled at them to stop, but the trio kept on running. A foot chase ensued. With the two detectives hot on their heels, Jackson, Leonard, and Franklin raced toward a nearby house. During the chase, both detectives saw Leonard reach into his waistband and ditch a Ziploc bag; they suspected that it contained marijuana.

Leonard reached the house first. He tried to shut the door behind him, but Jackson and Franklin forced their way inside. The detectives also managed to

squeeze inside, and immediately ordered everyone to the ground. Jackson and Franklin complied. Leonard, however, fled to a bedroom in the back of the house.

Detective Paul-Noel quickly identified Jackson as the man who had pointed the gun, so the officers arrested him. A post-arrest pat down revealed a handgun, as well as packets the officers thought contained heroin and Xanax, though lab tests later revealed they were not actually controlled substances. The officers also saw a bag of crack cocaine lying on the couch. They then ordered Leonard out of the back room and arrested him, finding $1,000 in cash and an electric scale in his pockets. Given all these facts, the officers applied for a search warrant; they thought it likely that more contraband would be found if they could look for it. They were right—once the officers executed the warrant, they found a loaded handgun and narcotics inside the back room where Leonard had been hiding. An expert later testified that Leonard was a "major contributor" to the DNA recovered off the firearm; the likelihood of the DNA matching another male profile was 1 in 18.02 *trillion*.

A federal grand jury indicted Leonard and Jackson for various crimes, including a felon-in-possession charge under 18 U.S.C. § 922(g). They each filed a motion to suppress the firearm, ammunition, and cocaine that the officers found, arguing that the initial entry into the home violated the Fourth Amendment and tainted the later discoveries. The district court denied their motions after a hearing. The court concluded that the officers had probable cause to arrest the men based on their reasonable belief that Jackson had committed a felony (aggravated assault) and that Leonard had committed an arrestable offense (possessing marijuana), not

3

to mention their flight from the scene of a crime. This was an "open and shut case"—the "textbook definition" of probable cause to arrest, according to the district court. And not only could the officers arrest the men, exigent circumstances meant that they could enter the residence to do so—they were in hot pursuit of fleeing suspects and the public was at risk if the three escaped. Nor was the search warrant a problem: drugs were discovered in plain view and the officers had plenty of reason to think more illegal substances would be found.

Still, Leonard and Jackson moved to reopen the suppression hearing after prosecutors disclosed that Detective Paul-Noel had made a mistake in his testimony. At the initial hearing, the detective was shown a security-footage clip that included a man taking off his shirt and waving it around on the street corner where Jackson first drew the detective's attention. He identified the person as Jackson. But after reviewing the footage again after the hearing, Detective Paul-Noel concluded that Jackson actually showed up in the video a little later. He did not, however, waver in his belief that it was Jackson who brandished the firearm on the day of the arrests. He reiterated that he had no doubt that Jackson was "the person [he] saw with the gun," and later testified at trial that he was "absolutely sure that was Mr. Jackson walking across the street," and was "absolutely positive of what [he] saw that day." The court denied the motion to reopen the suppression hearing, emphasizing that the detective's mistake did not imperil his personal observations. After all, the court said, everyone "knew from the beginning" that it was a "grainy video."

4

Around the same time, the Supreme Court had taken up a case called *Rehaif v. United States*, and was set to decide whether a defendant must know he belonged to a relevant category of persons barred from possessing a firearm to be convicted under § 922(g). 139 S. Ct. 2191 (2019). Just to be safe, the government sought a new indictment that it thought specifically charged the defendants with knowledge of their felon status. The indictment had previously alleged that Jackson and Leonard, "having been previously convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess a firearm . . . ." But the new indictment alleged that they "possessed a firearm . . . having previously been convicted of a crime punishable by imprisonment for a term exceeding one year, and did so knowingly." The government's caution paid off: soon after it secured the new indictment, the Supreme Court issued its opinion in *Rehaif* and confirmed that § 922(g) does require knowledge of status.

Still, Leonard and Jackson moved to dismiss their new indictment as legally insufficient under *Rehaif*. The court denied the motion. When Leonard raised the issue again at the beginning of trial proceedings, the government opposed dismissal; it informed the court that it had amended the indictment to prepare for *Rehaif*, and emphasized that the grand jurors were presented with evidence that the defendants knew their status as felons. Indeed, the parties had already signed stipulations agreeing that the government had proven beyond a reasonable doubt that the defendants knew they were convicted felons. So the case moved on to trial.

A jury found Leonard guilty of the felon-in-possession charge, but acquitted him of the drug charges.[1] The district court then determined that Leonard was subject to the Armed Career Criminal Act's 15-year mandatory minimum sentence because he had at least three qualifying convictions, and sentenced him to 20 years' imprisonment followed by five years' supervised release. *See* 18 U.S.C. § 924(e).

This appeal followed.

## II.

We review the sufficiency of an indictment de novo. *United States v. Pendergraft*, 297 F.3d 1198, 1204 (11th Cir. 2002). We review a district court's denial of a renewed motion to suppress, as well as the denial of a hearing to challenge a search warrant affidavit, for abuse of discretion. *United States v. Simms*, 385 F.3d 1347, 1356 (11th Cir. 2004); *United States v. Votrobek*, 847 F.3d 1335, 1342 (11th Cir. 2017). We also review for abuse of discretion evidentiary and jury instruction decisions. *United States v. Brown*, 587 F.3d 1082, 1091 (11th Cir. 2009); *United States v. Jockisch*, 857 F.3d 1122, 1126 (11th Cir. 2017). And we review the application of the Sentencing Guidelines de novo. *United States v. Massey*, 443 F.3d 814, 818 (11th Cir. 2006).

## III.

Leonard attacks his conviction and sentence on several fronts; we take each in turn. *First*, we consider Leonard's challenges to his indictment. *Second*, we

---

[1] Prior to trial, the government dismissed the drug-related charges against Jackson. The jury acquitted him of the remaining firearm possession count.

take up the district court's denial of his motion to reopen the suppression hearing. *Third*, we review the denial of his motion to hold a hearing to challenge the search warrant affidavit. *Fourth*, we evaluate whether cumulative error occurred at his trial. And *finally*, we look at the propriety of his sentence.

## A.

We start with the indictment. Leonard says that his indictment was defective for two reasons: it failed to charge a complete criminal offense and it did not inform him that he needed to know his status as a convicted felon. Neither argument persuades us.

## 1.

Congress has power over the jurisdiction of the lower federal courts. It has provided the district courts with jurisdiction over "all offenses against the laws of the United States." 18 U.S.C. § 3231. It follows that a district court lacks jurisdiction in a criminal case when an indictment fails to charge an offense against the United States. *See United States v. Moore*, 954 F.3d 1322, 1333 (11th Cir. 2020).

But a jurisdictional defect occurs "only where a federal court lacks power to adjudicate at all." *United States v. Sanchez*, 269 F.3d 1250, 1273 (11th Cir. 2001). And the right to a grand jury indictment informing the accused of the accusation against him is a personal right of the defendant—it does not affect the district court's power to adjudicate the case. *See id*. at 1273–74. So even when an appellate court decides that an indictment is defective, that "does not affect the jurisdiction of the trial court to determine the case presented by the indictment."

7

*United States v. Williams*, 341 U.S. 58, 66 (1951); *see also United States v. Cotton*, 535 U.S. 625, 631 (2002).  The Supreme Court, in fact, has declared itself "[f]reed from the view that indictment omissions deprive a court of jurisdiction."  *Cotton*, 535 U.S. at 631.

We have of course followed suit.  Our precedents make clear that if the conduct charged in an indictment is itself not criminal, "then an offense against the United States has not been pled and the district court lacks subject matter jurisdiction."  *Moore*, 954 F.3d at 1333.  But that occurs only when an indictment alleges facts that "conclusively negate[] the existence of any offense against the laws of the United States."  *United States v. Brown*, 752 F.3d 1344, 1353 (11th Cir. 2014).  So we have found a lack of subject matter jurisdiction when the alleged crime "simply did not exist in the United States Code"; when the conduct alleged "undoubtedly fell outside the sweep" of the cited statute; and where the violation was of a regulation that was "not intended to be a 'law' for purposes of criminal liability."  *Id.*  And we, like the Supreme Court, have already rejected the argument that Leonard brings here: the "absence of an element of an offense in an indictment is not tantamount to failing to charge a criminal offense against the United States." *Moore*, 954 F.3d at 1333.

Leonard nonetheless contends that his indictment did not charge a complete criminal offense because it failed to mention § 924(a)(2), which sets out the penalties for a § 922(g) violation.[2]  Section 924(a)(2), he reasons, is actually the

---

[2] Section 924(a)(2) provides that "[w]hoever knowingly violates subsection (a)(6), (d), (g), (h), (i), (j), or (o) of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both."  18 U.S.C. § 924(a)(2).

statute that makes prohibited firearm possession a federal crime—he argues that, because the "knowledge of status" element from *Rehaif* came from § 924(a)(2), charging only under § 922(g) is not charging a criminal offense.

We disagree. Section 922(g) is by itself a criminal offense. In fact, we already rejected this argument in *United States v. Morales*. *See* 987 F.3d 966, 979 (11th Cir. 2021). There, we explained that § 922(g) is still a criminal prohibition on its own terms. *Rehaif* held that § 922(g) *itself* contains the requirement that the defendant knew he belonged to the relevant category of persons when he possessed the firearm. *Id.* And because the text of § 922(g) implies a knowledge-of-status element, an indictment that alleges violations of § 922(g) confers subject matter jurisdiction. *Id.*; *see also Moore*, 954 F.3d at 1337. The bottom line is that the indictment here did enough to charge an offense against the United States—even after *Rehaif*. The district court, accordingly, had jurisdiction over Leonard's case.

2.

Moving on, Leonard says that even if his indictment did charge a criminal offense, it failed to give him adequate notice that the government needed to prove knowledge of status. There too we disagree.

An indictment is legally sufficient if it (1) contains the "essential elements" of the charged offense, (2) notifies the defendant of the charges to be defended against, and (3) protects the defendant from double jeopardy. *United States v. Woodruff*, 296 F.3d 1041, 1046 (11th Cir. 2002); *see also United States v.*

*Varkonyi*, 645 F.2d 453, 456 (5th Cir. 1981).[3] The ultimate question is not whether the indictment could have been drafted with more clarity, but whether it conforms to these standards. *Varkonyi*, 645 F.2d at 456. When determining whether an indictment is sufficient, we "read it as a whole and give it a common sense construction." *United States v. Jordan*, 582 F.3d 1239, 1245 (11th Cir. 2009) (quotation omitted); *see also United States v. Dentler*, 492 F.3d 306, 310–11 (5th Cir. 2007).

Leonard's indictment may meet that benchmark. It tracks the language of § 922(g), and adds the phrase "did so knowingly." Reasonably read, that extra phrase could be enough to extend the knowledge requirement to all the material elements of § 922(g)—including felon status. *See United States v. Maez*, 960 F.3d 949, 953 (7th Cir. 2020); *see also Jordan*, 582 F.3d at 1245.

But we need not decide that question because even if the indictment could have been better drafted, any error in its wording was harmless to Leonard. The criminal justice system is run by human beings. Though we all owe our best efforts, perfect proceedings are not required—or even possible. A criminal defendant thus has the right to a *fair* trial, but not one that is error-free. *See United States v. Roy*, 855 F.3d 1133, 1135 (11th Cir. 2017) (en banc).

A minimum requirement for unfairness is that an error caused prejudice to the defendant. Some errors are so fundamental that we presume prejudice. If the defendant is completely deprived of counsel, for example, or is put to trial before a

---

[3] In *Bonner v. City of Prichard*, this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. *See* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

biased judge, "the entire trial process" is infected and a court cannot measure actual prejudice. *See Neder v. United States*, 527 U.S. 1, 8 (1999) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993)). Those kinds of errors are part of a "very limited" set of "structural" errors that defy our ordinary review. *Id.* at 8–9 (quoting *Johnson v. United States*, 520 U.S. 461, 368 (1997)).

Outside of that set, though, it has long been the rule that any "error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a). In *Chapman v. California*, the Supreme Court said that same "harmless error" standard applies even if the claimed error is constitutional in nature. *See* 386 U.S. 18, 22–23 (1967). So "small errors or defects" that have little—if any—likelihood of changing the result are harmless, and do not require the automatic reversal of a conviction. *Id.* at 22.

Over the years, application of *Chapman*'s test has become routine. The "general rule" is that a constitutional error does not automatically require reversal. *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991); *see also Greer v. United States*, 141 S. Ct. 2090, 2099 (2021). In fact, "*most* constitutional errors can be harmless." *Fulminante*, 499 U.S. at 306 (emphasis added); *see also Roy*, 855 F.3d at 1143 ("[H]armless error analysis is the *rule*, not the exception." (emphasis added)). So the Court has applied harmless-error analysis to a "wide range of errors," including restrictions on the right to cross-examine witnesses, improper comments on a defendant's silence at trial, and admissions of improperly obtained confessions, to name a few. *See Fulminante*, 499 U.S. at 306–07 (listing errors). Those errors all have one thing in common: they do not "*necessarily* render a

11

criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Neder*, 527 U.S. at 9.

Of course, harmless-error review is "not a dead end." *United States v. Margarita Garcia*, 906 F.3d 1255, 1266 (11th Cir. 2018). We still review an error for its prejudicial effect, considering whether it resulted in an unfair trial for the defendant before us. That crucial review "acts as an adequate safeguard" in most cases—the impact of errors that are not structural can be assessed, and can lead to a new trial where necessary to ensure fairness. *Id.* at 1265–66. Moreover, the government bears the burden of showing that an error was "harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24. If it fails to carry that burden, we must reverse. Harmless-error review is by no means "toothless," but it does allow us to avoid overturning convictions after fundamentally fair trials. *Margarita Garcia*, 906 F.3d at 1265.

The Supreme Court has made clear that a *Rehaif* omission, like almost every other error, need not be structural. *See Greer*, 141 S. Ct. at 2100. And this Circuit already applies harmless-error review to the omission of an element from an indictment. *See Sanchez*, 269 F.3d at 1273. Other circuits do the same. *See, e.g., Dentler*, 492 F.3d at 310; *United States v. Rankin*, 929 F.3d 399, 404 (6th Cir. 2019); *United States v. Stevenson*, 832 F.3d 412, 426 (3d Cir. 2016). That is because this kind of error does not *necessarily* result in fundamental unfairness. It certainly may do so in some cases, but not in all, and we can measure prejudice by looking to the government's evidence, the defendant's admissions, and the other circumstances of the case. To make a long story short, the error Leonard alleges

12

does not "defy analysis." *Margarita Garcia*, 906 F.3d at 1266. We apply the harmless-error standard to his claim.

So was the error in Leonard's indictment—assuming there even was one—harmless? To meet this standard, the government must show that the error or defect had "little, if any, likelihood of having changed the result of the trial." *Chapman*, 386 U.S. at 22. If the error "did not contribute to the verdict obtained," then we cannot reverse. *Id.* at 24; *see also United States v. Pon*, 963 F.3d 1207, 1227 (11th Cir. 2020). To decide whether an error in an indictment contributed to the verdict against a defendant, we ask whether the indictment prejudiced his ability to defend himself against the crime charged and whether he was "harmed by losing the right to have the public determine whether there existed probable cause to charge the missing element." *Dentler*, 492 F.3d at 310–11 (quotation omitted).

Leonard's alleged error did not contribute—at all—to the verdict. For one, the alleged error did not affect his ability to defend himself against the charges. There is no question that, even if the indictment was not drafted perfectly, Leonard received adequate notice that he was being charged as a felon in possession of a firearm, and that the government needed to prove that he knew his felon status. Indeed, Leonard had more than the text of the new indictment to go on. After he challenged the superseding indictment in open court, the government explained that it had made the amendment "in advance of anticipating a decision in *Rehaif*." After hearing this explanation, Leonard moved to amend his knowledge-of-status stipulation—he knew what was going on.[4]

---

[4] The district court denied Leonard's request, and he does not challenge that decision on appeal.

Even more to the point, though, most people convicted of a felony know that they are felons—and the record is clear that Leonard had more than one prior conviction. *See United States v. Innocent*, 977 F.3d 1077, 1082 (11th Cir. 2020); *see also Greer*, 141 S. Ct. at 2097. We have no doubt that a jury would recognize that too. And Leonard, for his part, gives us no reason to conclude otherwise—he does not even attempt to argue that he did not know he was a felon at the time he possessed the gun or that he would have offered the jury evidence to prove this point. We thus have no reason to believe that Leonard would have presented any evidence on this issue. He suffered no prejudice to his ability to defend himself against the felon-in-possession charge.

The second factor we consider is whether Leonard was harmed by losing the right to have the public determine whether there was probable cause to charge the missing element. *See Dentler*, 492 F.3d at 310–11. We ordinarily would consider "whether, on the basis of the evidence that would have been available to the grand jury, any rational grand jury presented with a proper indictment" would have charged that offense. *Id.* at 311 (quoting *United States v. Robinson*, 367 F.3d 278, 288 (5th Cir. 2004)). Here, though, that public-charge factor is not even in play. The government told the district court that when it amended the indictment, the grand jurors were "presented with evidence" that Leonard knew his status as a felon. Leonard does not dispute this.

14

Given all this, we conclude that the potential error Leonard complains of did not contribute to the verdict against him. *Chapman*, 386 U.S. at 22. And because Leonard was not prejudiced, any error in the charging document was harmless.[5]

### B.

Leonard next alleges that "new evidence" came out after his suppression hearing that casts doubt on the court's earlier finding that the officers had probable cause to arrest. He points to two discoveries in particular: (1) the government's disclosure that Detective Paul-Noel at one point misidentified Jackson when viewing security camera footage of the scene, and (2) lab tests that showed that the drugs found on Jackson were not controlled substances. Leonard asks for a new suppression hearing based on these pieces of evidence.

Once a motion to suppress is denied, the legal basis of that denial ordinarily becomes the law of the case and the defendant may not relitigate the issue. *United States v. Montos*, 421 F.2d 215, 220 (5th Cir. 1970). We review a district court's decision to reopen a suppression hearing for abuse of discretion. *United States v. Watkins*, 760 F.3d 1271, 1284 (11th Cir. 2014).

---

[5] Leonard also claims that the jury instructions "constructively amended" his indictment. But a constructive amendment occurs when instructions *broaden* the bases for conviction, not when they narrow them. *See United States v. Madden*, 733 F.3d 1314, 1318–19 (11th Cir. 2013). Leonard's argument is that the instructions narrowed the bases for conviction by requiring additional knowledge. We also note that the court here went beyond what *Rehaif* requires, instructing the jury that, to be found guilty, Leonard needed to know that he was a convicted felon *and* that he could not possess a gun. The court did not need to go that far. In a prosecution under § 922(g), the government must prove that a defendant knew of his *status* as a person barred from possessing a firearm, but it does not need to prove that the defendant knew he could not possess a gun. *See Rehaif*, 139 S. Ct. at 2200.

15

The "new evidence" Leonard points to does not contradict the testimony the court considered at the suppression hearing. To start, Detective Paul-Noel's misidentification of Jackson when viewing a portion of the security camera footage from the scene does not do anything to change or impeach the detective's personal observations from the day of the arrests. The court found that those personal observations—that he saw Jackson brandish a gun at a crowd, saw the three men flee an area of crime, and saw Leonard drop a bag of marijuana—were firm, and gave the detective probable cause to arrest the men. *See Virginia v. Moore*, 553 U.S. 164, 176 (2008). The detective did not waver on those points; in fact, he recounted them at the suppression hearing and even identified Jackson in the courtroom as the man with the gun. The fact that he made a mistake when viewing grainy footage a year later does not affect the court's finding that he had probable cause to arrest based on what he observed with his own eyes. *Simms*, 385 F.3d at 1356.

The same goes for Leonard's lab-test argument. Probable cause is based on what a reasonable officer would think at the time of arrest—not on what they could understand with the benefit of hindsight. *See Florida v. Harris*, 568 U.S. 237, 249 (2013). And probable cause requires only a substantial chance of criminal activity, not certainty. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018). The fact that the drugs turned out to be legal is not inconsistent with the officers' belief at the time that they were illegal. Leonard does not suggest that the officers' belief was unreasonable, and nothing in the record suggests that it was, or that the officers should have suspected otherwise. So even if the court considered the test

16

results that came out at trial, it would reach the same result on Leonard's motion to suppress. *Simms*, 385 F.3d at 1356. The court did not err, then, in denying Leonard's motion to reopen.[6]

C.

Leonard also challenges the veracity of the search warrant affidavit. He says that upon arrest, Jackson immediately claimed ownership of the drugs on the couch and the gun found on his person. This alleged statement by Jackson was not in the search warrant affidavit, and Leonard argues that the officers deliberately or recklessly omitted it.

A defendant is only entitled to challenge the veracity of a search warrant affidavit at a hearing if he makes a "substantial preliminary showing" that (1) the author of the affidavit made false statements or omissions "either intentionally or with reckless disregard for the truth," and (2) the allegedly false statement or omission was "necessary to the finding of probable cause." *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009). So even in the face of a deliberate omission, no hearing is required when there was enough evidence to support a probable cause finding even after considering the effect of the omission. *United States v. Goldstein*, 989 F.3d 1178, 1197 (11th Cir. 2021).

Here, even if Jackson's statement had been included in the affidavit, it would not have tipped the balance. The officers still would have had probable

---

[6] The other evidence Leonard points to was known at the time of the suppression hearing and considered by the trial court. The court did not abuse its discretion in refusing to reopen its probable cause finding based on arguments it had already considered. *See Simms*, 385 F.3d at 1356.

cause to search the home, because the totality of the circumstances indicated a fair probability—at least—of finding contraband or evidence in the home. *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999). The officers, after all, found a firearm and suspected controlled substances on Jackson's person, and crack cocaine lying on the couch. Jackson's claim of ownership did not diminish the likelihood that more evidence of his crimes would be found elsewhere in the home. *See id.*; *see also United States v. Sarras*, 575 F.3d 1191, 1218–19 (11th Cir. 2009). The trial court did not err in refusing to hold a hearing on the basis of that omitted statement. *Goldstein*, 989 F.3d at 1197.

### D.

Leonard next contends that a new trial is required because of the cumulative effect of a series of rulings by the trial court and actions by the prosecutor. Under the cumulative error doctrine, we reverse a conviction if the aggregation of non-reversible errors yields a denial of the constitutional right to a fair trial. *United States v. Capers*, 708 F.3d 1286, 1299 (11th Cir. 2013). But "cumulative" error is not possible when there is only one error or no errors at all. *See United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011). That is the case for Leonard.

*First*, he points to the district court's refusal to admit evidence that the homeowner's ex-husband had a previous felon-in-possession conviction. But evidence is only relevant—and therefore admissible—if it is probative of a material fact. *See* Fed. R. Evid. 401; *see also United States v. McGregor*, 960 F.3d 1319, 1324 (11th Cir. 2020). Here, the probative value of this evidence was weak, to say the least—there was no reason to think that the ex-husband had even been

18

inside the home for years.  The district court's choice to exclude it was not error. *McGregor*, 960 F.3d at 1324.

*Second*, Leonard insists that the court erred when it refused to give his theory-of-the-defense instruction.  Though he submitted the proposed instruction at the outset of the charge conference, the parties never actually discussed it.  In fact, when the court asked at the end of the conference whether the parties were satisfied with the final instructions, Leonard said that the proceedings "took care of the issues"—he did not argue that the final instructions should include his theory of defense.  It was only after the jury began deliberating that he remembered and reminded the court of his theory-of-the-defense instruction.

We see no error in the district court's decision.  Leonard wanted the court to remind the jury that he denied all responsibility for the drugs and the firearm found in the back bedroom.  But that same argument featured prominently throughout the trial, including during closing arguments.  *See United States v. Lebowitz*, 676 F.3d 1000, 1015 (11th Cir. 2012).  And the subject matter of his requested instruction was already substantially covered by the district court's overall charge to the jury. *United States v. Ndiaye*, 434 F.3d 1270, 1293 (11th Cir. 2006).  The court instructed the jury that Leonard could only be found guilty if he knowingly possessed the firearm; that means it addressed his theory in its instructions.  *Id.* Leonard was able to present an effective defense despite the omission of his proposed instruction.  The jury, then, was properly guided in its deliberations, and the district court did not err in denying his request.

*Third*, Leonard argues that an improper statement by the prosecutor prejudiced his substantial rights. During closing rebuttal, the prosecutor said that "this was a case about protecting our communities from guns and from drugs." The court immediately gave a curative instruction, reminding the jury that the case was "about whether or not the Government has proven beyond a reasonable doubt the charges that have been filed against both Mr. Jackson and Mr. Leonard, nothing more, nothing less." To establish prosecutorial misconduct, Leonard needed to show not only that the remark was improper, but that it prejudicially affected his substantial rights. *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009). He cannot do so. This was one isolated remark, and it was neutralized by a curative instruction—one which we presume the jury followed. *See id.*; *see also United States v. Gainey*, 111 F.3d 834, 836 (11th Cir. 1997). The statement, even if improper, did not impact the outcome of his case. *Lopez*, 590 F.3d at 1256.

*Finally*, Leonard says he has a double jeopardy problem because both the state and federal governments pursued charges against him. He rightfully concedes that this position is foreclosed by Supreme Court precedent. *See Gamble v. United States*, 139 S. Ct. 1960 (2019).

In short, because Leonard points to—at most—one harmless error, his cumulative error argument fails. *Gamory*, 635 F.3d at 497.

## E.

Leonard's last challenge is to his sentence. *See* 18 U.S.C. § 924(e). Under the Armed Career Criminal Act, a felon in possession of a firearm is subject to a mandatory minimum sentence of 15 years' imprisonment if he has three prior

20

convictions for serious drug offenses "committed on occasions different from one another." *Id.* § 924(e)(1).  The sentencing court concluded that each of Leonard's three cocaine trafficking convictions qualified as a predicate offense; Leonard, however, contends that the three convictions should have been scored as one offense because he was sentenced on the same day for all three crimes.

Leonard's argument misunderstands ACCA's separate conviction requirement.  He is right that the three prior crimes must be "temporally distinct." *United States v. Sneed*, 600 F.3d 1326, 1329 (11th Cir. 2010) (quoting *United States v. Sweeting*, 933 F.2d 962, 967 (11th Cir. 1991)).  But he misses that it is the *crimes* that must be temporally distinct, not the *convictions* for those crimes.  Even small distinctions in "time and place" are usually enough.  *See id.* at 1330.  Here, Leonard's three offenses occurred on different days *and* were separated by intervening arrests.  It does not matter that he was sentenced on the same day for the three crimes.  *United States v. Wilks*, 464 F.3d 1240, 1244 (11th Cir. 2006).  So because the three crimes were temporally distinct for ACCA purposes, the district court did not err in designating Leonard an armed career criminal.[7]

---

[7] Because we uphold the armed career criminal designation, we need not decide whether the district court erred in enhancing Leonard's offense level under United States Sentencing Guideline § 2K2.1(b)(6)(B) for possessing a firearm in connection with another felony offense. The minimum offense level for an armed career criminal is 33, which was the offense level the district court used.  United States Sentencing Guidelines Manual § 4B1.4(b)(3)(B) (Nov. 2018). And because Leonard has not adequately briefed the issue on appeal, he has abandoned any challenge to the district court's calculation of his criminal history.  *United States v. Smith*, 967 F.3d 1196, 1204 n.5 (11th Cir. 2020).

\*    \*    \*

For the reasons explained above, we **AFFIRM** Leonard's conviction and sentence.